1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
                                     AT SEATTLE

9

10   ANNALIZA ELLORIN,                          CASE NO. C12-1932JLR

11                     Plaintiff,                ORDER ON MOTIONS FOR
                                                 SUMMARY JUDGMENT
12          v.

13   APPLIED FINISHING, INC., et al.,

14                     Defendants.

15                         **I.      INTRODUCTION**

16          Before the court are:  (1) Defendant Applied Finishing, Inc.'s ("Applied

17   Finishing") motion for summary judgment (AF Mot. (Dkt. # 21)), and (2) Defendant

18   Michael Soden's motion for summary judgment (Soden Mot. (Dkt. # 22)).  The court has

19   considered the motions, all submissions filed in support of and opposition thereto, the

20

21

22

ORDER- 1

1  balance of the record, and the applicable law.[1]  Being fully advised the court GRANTS in

2  part and DENIES in part both motions as discussed below.

3  ## II.     BACKGROUND

4       In this lawsuit, Plaintiff Annaliza Ellorin brings federal and state law claims

5  alleging that Mr. Soden sexually harassed her and discriminated against her, and that her

6  employer, Applied Finishing, did not take reasonable steps to investigate the harassment

7  or ensure the implementation of appropriate corrective actions.

8       Ms. Ellorin immigrated to the United States in 1988 from the Philippines.  (Ellorin

9  Decl. (Dkt. # 34) ¶ 1.)  She can speak and understand some English, but does not

10  consider herself to be fluent.  (*Id.* ¶ 3.)  Applied Finishing is a business that paints metal

11  and plastic parts for the aerospace industry.  (R. Bickle Decl. (Dkt. # 24) ¶ 1.)  The

12  company is located in Mukilteo, Washington, and is owned by Randy and Pam Bickle

13  and Mike and Heather Alligood.  (*Id.*)  Mr. Soden is the operations manager at Applied

14  Finishing.  (Barnes Decl. (Dkt. # 30) Ex. A ("Bickle Dep.") at 12:10-14; Ex. B ("Soden

15  Dep.") at 23:19-20.)

16       Ms. Ellorin worked at Applied Finishing from mid-October 2011, to January 22,

17  2012, through Express Personnel Service.  (Ellorin Decl. ¶ 2.)  She became a full-time

18  employee directly with Applied Finishing on January 22, 2012, and worked there until

19  May 3, 2013.  (*Id.*)  Ms. Ellorin's job entailed masking parts before they were painted.

20  (*See id.* ¶¶ 2-3; Barnes Decl. Ex. D ("Ellorin Dep.") at 8-10.)  She worked at an open

21

22       [1] No party requested oral argument on either motion, and the court deems both motions to be appropriate for decision without it.

1    table with five other women employees who were also masking parts.  (Ellorin Dep. at 8-

2    10, 12, 34-36.)  With the exception of "a couple" of men, the majority of employees in

3    the masking and packaging area of Applied Finishing's facility are women.  (Bickle Dep.

4    at 13:22-14:5.)

5            Applied Finishing hired Mr. Soden to manage operations, including facility

6    management.  (Soden Decl. (Dkt. # 23) ¶ 2.)  In this position, Mr. Soden assists in setting

7    up production lines and establishing workforce requirements.  (Bickle Dep. at 12:18-24.)

8    Mr. Soden maintains that his duties do not include hiring, firing, directing, or in any other

9    way managing or supervising any employees.  (Soden Decl. ¶ 2; Soden Dep. at 23:23-

10   24:9.)  Mr. Randy Bickle, the president of Applied Finishing and one of its owners, also

11   maintains that Mr. Soden does not supervise or manage any employees.  (*See* Bickle Dep.

12   at 12:23-24 ("[Mr. Soden] didn't supervise or manage any employees.").)

13           Nevertheless, there is conflicting testimony about Mr. Soden's involvement in

14   supervising others at Applied Finishing.  Some employees have testified that he

15   supervised their work at least to some degree.  (*See, e.g.*, Gillum Decl. (Dkt. # 26) ¶ 3;

16   *see also* Ellorin Decl. ¶ 4.)  Further, contrary to Mr. Soden's testimony, Mike Alligood,

17   the production manager and one of the company's owners, testifies that Mr. Soden has

18   participated in hiring employees.  (Barnes Decl. Ex. C ("Alligood Dep.") at 6:3-4 ("Q:

19   Has [Mr. Soden] participated in the hiring of employees? A:  Yes."); *see also id.* at 5:18-

20   6:2; 6:5-10:9.)  Further, Mr. Alligood testifies that, although Mr. Soden does not have

21   direct authority to terminate an employee, he could "voice his opinion" or recommend the

22

1   termination of an employee, and in fact has commented on employees and their

2   performance.  (Alligood Dep. at 10:4-13.)

3        Ms. Ellorin states that she was initially hired in a masking production and quality

4   assurance position.  (Ellorin Decl. (Dkt. # 34) ¶ 2.)  She testifies that Mr. Alligood told

5   her that he wanted her learn the facility first, and that once she had done so, she could

6   move into the quality assurance position.  (*Id.*)  Ms. Ellorin testifies that Mr. "Soden was

7   the manager, and he would instruct the employees in masking and packaging . . . and

8   give . . . instructions on a daily basis."  (*Id.* ¶ 4; *see also* Gillum Decl. (Dkt. # 26) ¶ 3

9   ("Mike Soden does not have authority over the Production team, including maskers,

10  although initially, he would sometimes tell the maskers how to do their work on

11  particular projects he was overseeing.").)

12       Ms. Ellorin immediately saw Mr. Soden "being overly friendly" with some

13  women employees and "greeting them with hugs."  (*Id.*)  Three weeks after Ms. Ellorin

14  began full-time employment with Applied Finishing, Mr. Soden approached her and

15  asked her to join him for a drink after work.  (*Id.* ¶ 5.)  She declined.  (*Id.*)

16       Ms. Ellorin states that in her interactions with Mr. Soden, he would touch her

17  hand, grab it tightly, or rub her arms.  (*Id.* ¶ 6.)  She testifies that Mr. Soden would "find

18  a reason to touch [her] on a daily basis" and "would stand so close that it would make

19  [her] uncomfortable" and make it "difficult to concentrate on [her] work."  (*Id.*)  Once as

20  he walked by, Mr. Soden blew Ms. Ellorin a kiss.  (*Id.* ¶ 6.)

21

22

ORDER- 4

Ms. Ellorin also testifies that Mr. Soden would touch her coworker, Martha, on her arms and hands (*id.* ¶ 7), and she was told he had slapped another coworker on her buttocks and afterwards was "very flirty" (*id.* ¶ 11).

During the first week of March 2012, Ms. Ellorin testifies that Mr. Soden asked her to go out with him for a second time. (*Id.* ¶ 10.) She declined the invitation again, but testifies that Mr. Soden "continue[d] to touch and rub [her] as he came around with increasing frequency." (*Id.*) During the same month, Mr. Soden surprised Ms. Ellorin by standing behind her when she was unaware of his presence and breathing on the back of her neck. (*Id.* ¶ 12.) When she turned around, she found Mr. "Soden blowing air on [her] neck and in [her] ear while standing up close and sniffing [her]." (*Id.*) She was startled by Mr. Soden's behavior and screamed loudly. (*Id.* ¶ 12.) Ms. Ellorin states that Michelle Gillum, who was Ms. Ellorin's "lead," saw Mr. Soden do this, asked Ms. Ellorin if she was okay, and said, "I saw your reaction and what he did was not right." (*Id.*)

In late March or early April, Ms. Ellorin testifies that Mr. Soden told the staff that she was such a good employee that she was "going to become the staff quality assurance person" because Ms. LuAnn Wible needed her help. (*Id.* ¶ 14.) Mr. Soden told Ms. Ellorin to give her resume to Ms. Wible. (*Id.*) Ms. Ellorin testifies that Ms. Wible began to train her in the position and that she began performing the job. (*Id.*)

Ms. Ellorin states that on May 11, 2012, on her way out the door, Mr. Soden said to her: "Have a good weekend and don't forget to scream my name loud tonight." (*Id.* ¶ 16.) Ms. Ellorin reported this and earlier events involving Mr. Soden to her husband.

1   (*Id.* ¶¶ 13, 16.)  On May 14, 2012, Ms. Ellorin's husband, Mr. Shawn Lee, called Applied

2   Finishing and reported Mr. Soden's behavior to Mr. Bickle.  (*Id.* ¶ 17.)  Ms. Ellorin also

3   later reported all of the foregoing events to Mr. Bickle directly.  (*Id.*)

4        Prior to the telephone call from Mr. Lee, Mr. Bickle testifies that Ms. Ellorin had

5   never complained to him or any of her other supervisors about Mr. Soden's conduct.  (R.

6   Bickle Decl. (Dkt. # 24) ¶ 4.)  Indeed, Mr. Bickle states that Applied Finishing had never

7   received a complaint by any female employee concerning Mr. Soden or anyone else.  (*Id.*

8   ¶ 3.)  However, as noted above, Ms. Ellorin has testified that Ms. Gillum, her "lead,"

9   observed at least some of Mr. Soden's behavior and told Ms. Ellorin that "what he did

10  was not right."  (Ellorin Decl. ¶ 12.)

11       Following his telephone conversation with Mr. Lee, Mr. Bickle met with Mr.

12  Soden and, without reaching a determination that Mr. Soden had been involved in sexual

13  harassment, counseled him about the company's expectations concerning his conduct.

14  (*Id.*; *see also* Bickle Dep. at 32:17-36:13.)

15       In addition, Office Manager Pam Bickle also met with other female employees in

16  the plant to investigate whether other employees in the plant had any problems with Mr.

17  Soden.  (P. Bickle Decl. (Dkt. # 25)  ¶¶ 2-9.)  Ms. Bickle testifies that almost all of the

18  women in the plant indicated that everything was fine and that they were not

19  uncomfortable with Mr. Soden or his behavior.  (*See generally id.*)  However, at least one

20  other woman, Ms. Wible, repeatedly complained about Mr. Soden's behavior to Ms.

21  Bickle (*see id.* ¶¶ 4-5, 9) and another reported that Mr. Soden had "slapped her once on

22

1   the bottom" albeit prior to Mr. Bickle's conversation with Mr. Soden about the

2   company's expectations concerning his conduct (*id.* ¶ 7).

3          The day after Mr. Lee called Mr. Bickle to report Mr. Soden's behavior, Ms.

4   Ellorin testifies that Mr. Soden blew her a kiss as she was on her way to her work area.

5   (Ellorin Decl. ¶ 18.)  Three weeks later, another coworker informed Ms. Ellorin that Mr.

6   Soden "had touched her hands and arms and hugged her inappropriately."  (*Id.*  ¶ 19.)

7   Ms. Ellorin also testifies that she overhead Mr. Soden asking another employee out.  (*Id.*

8   ¶ 21.)

9          On August 20, 2021, Mr. Lee visited Applied Finishing, talked with Mr. Bickle a

10  second time, and reported Mr. Soden's further conduct.  (*Id.* ¶ 22; Lee Decl. (Dkt. # 37)

11  ¶¶ 5-6; R. Bickle Decl. ¶ 5; Ellorin Decl. ¶ 22.)  Mr. Lee testifies that Mr. Bickle did not

12  say anything in response, but "just shook his head and listened."  (Lee Decl. ¶ 7.)  Mr

13  Bickle testifies that he explained to Mr. Lee the steps he had taken to investigate the

14  complaint and to counsel Mr. Soden concerning his conduct.  (*See* R. Bickle Decl. ¶ 5.)

15         Following the second conversation between Mr. Lee and Mr. Bickle, Ms. Ellorin

16  testifies that Mr. Soden "finally stopped his advances but he continued to give [her] angry

17  looks."  (Ellorin Decl. ¶ 22.)  Nevertheless, Ms. Ellorin testifies that she was never given

18  the quality assurance position that she had been promised, and that the position went

19  instead to another employee, Antonio Martinez.  (*Id.* ¶ 23.)  Mr. Bickle, on the other

20  hand, denies that the quality assurance position was ever created—let alone filled by Mr.

21  Martinez instead of Ms. Ellorin.  (R. Bickle Decl. ¶ 2.)

22

1    On May 3, 2013, Ms. Ellorin was laid off.  (Ellorin Decl. ¶ 24.)  Mr. Bickle

2    indicates that Applied Finishing has laid off close to fifty percent of its workforce, and

3    that Ms. Ellorin was laid off because she was the most junior worker in the masking

4    department.  (R. Bickle Decl. ¶ 2.)

5                              **III.    ANALYSIS**

6         In her complaint, Ms. Ellorin alleges four federal claims against both Mr. Soden

7    and Applied Finishing under Title VII of the Civil Rights Act of 1964, as amended, 42

8    U.S.C. § 2000e *et seq.*, including  (1) sex discrimination based on a hostile work

9    environment (Compl. (Dkt. # 1) ¶¶ 32-37); (2) quid pro quo sexual harassment (*id.* ¶¶ 39-

10   45); and (3) sexual discrimination based on differential treatment (*id.* ¶¶ 46-50); and (4)

11   retaliation (*id.* ¶¶ 51-55).  She also alleges these four claims against both Defendants

12   under the Washington Law Against Discrimination ("WLAD"), chapter 49.60 RCW.

13   (Compl. ¶¶ 78-101.)  Ms. Ellorin alleges several other state law claims as well, including:

14   (1) sexual battery (*id.* ¶¶ 56-62); (2) intentional infliction of emotional distress (*id.* ¶¶ 63-

15   67); (3) negligent infliction of emotional distress (*id.* ¶¶ 68-72), and (4) negligent hiring

16   against Applied Finishing only (*id.* ¶¶ 73-77).  Applied Finishing and Mr. Soden have

17   moved separately for summary judgment with respect to all of Ms. Ellorin's claims and

18   any punitive damages award.  (*See generally* AF Mot.; Soden Mot.)

19       **A.  Standards**

20       Federal Rule of Civil Procedure 56(a) requires the court to grant summary

21   judgment if the movant shows that there is no genuine dispute as to any material fact and

22   the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Entry of

1    summary judgment is appropriate "against a party who fails to make a showing sufficient

2    to establish the existence of an element essential to that party's case, and on which that

3    party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

4    (1986).

5           The movant bears the initial responsibility of informing the district court of the

6    basis for its motion, and identifying those portions of the pleadings, depositions, answers

7    to interrogatories, and admissions on file, together with the affidavits, which it believes

8    demonstrate the absence of a genuine issue of material fact. *Id.* at 323.  A moving party

9    without the ultimate burden of persuasion at trial has both the initial burden of production

10   and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire &*

11   *Marine Ins. Co. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).  If the

12   moving party meets its initial burden, the burden then shifts to the opposing party to

13   establish a genuine issue as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith*

14   *Radio Corp*., 475 U.S. 574, 586 (1986).

15          The purpose of summary judgment is to pierce the pleadings and to assess the

16   proof in order to see whether there is a genuine need for trial. *Id*. at 587.  In resolving a

17   summary judgment motion, the evidence of the opposing party is to be believed,

18   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985), and all reasonable inferences

19   that may be drawn from the facts placed before the court must be drawn in favor of the

20   opposing party, *Matsushita*, 475 U.S. at 587.

21          Both the Ninth Circuit and Washington courts have set a high standard for

22   granting summary judgment in employment discrimination cases.  Washington courts

1    have stated that summary judgment "should rarely be granted in employment

2    discrimination cases." *See e.g*., *Sangster v. Albertson's, Inc*., 991 P.2d 674, 677 (Wash.

3    Ct. App. 2000).[2]  The Ninth Circuit has cautioned that "very little evidence" is needed "to

4    survive summary judgment in a discrimination case, because the ultimate questions is one

5    that can only be resolved through a searching inquiry—one that is most appropriately

6    conducted by the fact-finder, upon a full record." *Schnidrig v. Columbia Mach, Inc.*, 80

7    F.3d 1406, 1410 (9th Cir. 1996) (internal quotation marks omitted).

8          **B.  Individual Liability under Title VII and WLAD**

9          Mr. Soden has moved for summary judgment on all of Ms. Soden's claims under

10   Title VII and WLAD as those claims pertain to him.  He asserts that Title VII does not

11   provide for individual liability on the part of employees and that WLAD is not applicable

12   to non-supervisory employees.  (Soden Mot. at 3, 11-12.)

13          **1.  Mr. Soden's Liability under Title VII**

14         To the extent that Ms. Ellorin is seeking to assert claims against Mr. Soden under

15   Title VII (*see* Compl. (Dkt. # 1) ¶¶ 32-55), such claims are subject to dismissal because

16   the statute does not provide for individual liability.  In interpreting Title VII, the Ninth

17   Circuit has held that the statute only applies to employers, not employees.  *Miller v.*

18   *Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).  "The statutory scheme itself

19   indicates that Congress did not intend to impose individual liability on employees."  *Id.*

20   _____

21         [2] However, in order to defeat summary judgment, the employee "must establish specific
     and material facts to support each element of her prima facie case."  *Marquis v. City of Spokane*,

22   922 P.2d 43, 48 (Wash. 1996) (employee "must do more than express an opinion or make
     conclusory statements").

ORDER- 10

1    "Title VII limits liability to employers with fifteen or more employees . . . because

2    Congress did not want to burden small entities with the costs associated with litigating

3    discrimination claims.  If Congress decided to protect small entities with limited

4    resources from liability, it is inconceivable that Congress intended to allow civil liability

5    to run against individual employees."  *Id.*  Thus, as a matter of law, Ms. Ellorin is barred

6    from asserting any claim under Title VII against Mr. Soden.  The court, therefore, grants

7    Mr. Soden's motion for summary judgment with regard to his personal liability under

8    Ms. Ellorin's Title VII claims.  (Soden Mot. at 3.)

9                    **2.  Mr. Soden's Liabilty under WLAD**

10           Mr. Soden also asserts that he is entitled to summary judgment with respect to Ms.

11   Ellorin's claims under WLAD because he was not acting in a supervisory capacity.

12   (Soden Mot. at 11-12.)  Under the WLAD, "individual supervisors, along with their

13   employers, may be held liable for their discriminatory acts."  *Brown v. Scott Paper*

14   *Worldwide Co.*, 20 P.3d 921, 928 (Wash. 2001) ("We hold individual supervisors, along

15   with their employers, may be held liable for their discriminatory acts.  The plain meaning

16   of RCW 49.60.040(3), by its very terms, encompasses individual supervisors and

17   managers who discriminate in employment.").  In so holding, the Washington Supreme

18   Court noted that WLAD and Title VII "offer significantly different definitions of the term

19   'employer'."  *Brown*, 20 P.3d at 926.[3]

20   _____

21       [3] *See e.g.*, *Marquis v. City of Spokane*, 922 P.2d 43, 50 (Wash. 1996) (interpretation of
     federal antidiscrimination statutes is persuasive unless the provisions in those statutes differ from
22   those in chapter 49.60 RCW).

1    In order to be held personally liable under WLAD, a supervisor must have acted

2    "in the interest of [the] employer."  *Brown*, 20 P.3d at 926; *see also Jenkins v. Palmer*, 66

3    P.3d 1119, 1121 (Wash. Ct. App. 2003) (under *Brown*, "managers and supervisors may

4    be personally liable under WLAD when acting in their employer's interest").

5    Washington decisions look to such persons' involvement in the employment policy or

6    decisions that result in discrimination and hold them liable for their own discriminatory

7    acts.  *Id.* at  926-28.  Here, Mr. Soden was allegedly involved in fulfilling his job-related

8    duties at the time much or all of the conduct at issue occurred.  Further, as discussed

9    below, the court concludes that there is an issue of fact concerning Mr. Soden's

10   supervisory status with respect to Ms. Ellorin under the more restrictive Title VII case

11   authority.  (*See infra* § III.D.)  If there is an issue of fact with respect to Mr. Soden's

12   supervisory capacity under Title VII case authority, then there is also one under WLAD's

13   more permissive strictures concerning supervisory status.  Accordingly, the court denies

14   Mr. Soden's motion for summary judgment on this issue.

15   **C.  Hostile Work Environment under Title VII and WLAD**

16   Claims for gender discrimination based on hostile working environment are

17   recognized under both Title VII and WLAD.  *See, e.g., Nichols v. Azteca Restaurant*

18   *Enter., Inc*., 256 F.3d 864 (9th Cir. 2001); *Estevez v. Faculty Club of Univ. of Wash.*, 120

19   P.3d 579, 588 (Wash. Ct. App. 2005).  Both Applied Finishing and Mr. Soden assert that

20   they are entitled to summary judgment on Ms. Ellorin's claims for hostile work

21   environment because, even if taken at face value, Ms. Ellorin's allegations do not amount

22

1  to a "severe and pervasive" hostile work environment based on the objective standard of

2  a "reasonable person" in the workplace.  (AF Mot. at 5-10; Soden Mot. at 6-11.)

3      To establish a hostile work environment claim based on sexual harassment, Ms.

4  Ellorin must show that she was subjected to verbal or physical conduct of a sexual nature,

5  that was unwelcome, and that was sufficiently severe or pervasive to alter the conditions

6  of her employment and create an abusive working environment.  *Westendorf v. W. Coast*

7  *Contractors of Nev., Inc.*, 712 F.3d 417, 421 (9th Cir. 2013).  In addition, she must show

8  that a "reasonable person" would find the work environment to be "hostile or abusive"

9  and that she in fact found it so.  *Id.*  "In analyzing whether the alleged conduct created an

10  objectively hostile work environment, we must assess all the circumstances, including the

11  frequency of the discriminatory conduct; its severity; whether it is physically threatening

12  or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

13  an employee's work performance."  *Dominguez–Curry v. Nevada Transp. Dept.*, 424

14  F.3d 1027, 1034 (9th Cir. 2005).  In evaluating the conduct at issue, "[t]he required level

15  of severity or seriousness varies inversely with the pervasiveness or frequency of the

16  conduct."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004) (citing

17  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted)).

18      Courts should bear in mind, however, that "Title VII is not a general civility

19  code."  *E.E.O.C. v. Prospect Airport Services, Inc.*, 621 F.3d 991, 998 (9th Cir. 2010).

20  "A violation is not established merely by evidence showing sporadic use of abusive

21  language, gender-related jokes, and occasional teasing."  *Id.*

22

ORDER- 13

1    Although it is not binding, Washington courts look to Title VII case law for

2    instruction or persuasive authority in construing WLAD.  *See Glasgow v. Georgia–*

3    *Pacific Corp.*, 693 P.2d 708, 711, n.2 (Wash. 1985); *Valdez–Zontek v. Eastmont Sch.*

4    *Dist.*, 225 P.3d 339, 354 (Wash. Ct. App. 2010).  Accordingly, the court's analysis of

5    federal law applies to Ms. Ellorin's claim for hostile work environment under WLAD as

6    well.  *See Hardage v. CBS Broadcasting Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2005);

7    *Alonso v. Qwest Commc'ns. Co., LLC*, 315 P.3d 610, 616, n.11 (Wash. Ct. App. 2013)

8    ("Because our discrimination laws substantially parallel Title VII of the Civil Rights Act

9    of 1964, we may look to federal law for guidance.")

10   In asserting that it is entitled to summary judgment on Ms. Ellorin's hostile work

11   environment claims, Applied Finishing relies primarily on the Washington Court of

12   Appeals decision in *MacDonald v. Korum Ford*, 912 P.2d 1052 (Wash. Ct. App. 1996).

13   (AF Mot. at 6.)  In *MacDonald*, the plaintiff complained about the actions of two

14   coworkers.  She testified that the first coworker had kissed her once at a New Year's Eve

15   party, but that beyond this single incident he had never treated her in an inappropriate

16   way.  *MacDonald*, 912 P.2d at 1058.  The court held that this isolated incident could not

17   support a hostile work environment claim.  *Id.*

18   The *MacDonald* plaintiff also testified that a second coworker had a habit of

19   coming up behind her and placing his hand on her back and that he would position

20   himself in the hallway so she would brush against him when she passed.  *Id.*  Although

21   the plaintiff found the second coworker's behavior offensive and irritating, she "did not

22   perceive these actions to be sexual harassment at the time they occurred."  *Id.*  She also

ORDER- 14

1    recalled two instances when this coworker used inappropriate language or gestures in her

2    presence, although at least with respect to one of these instances "she was unsure whether

3    [he] meant it to have sexual overtones." *Id.*  Based on this record, the appellate court

4    held that the trial court did not abuse its discretion in concluding that the plaintiff's

5    lawyer lacked a factual basis for pursuing a hostile work environment claim.  *Id.* at 1059.

6          Defendants assert that Ms. Ellorin's allegations are similarly mild.  For example,

7    Mr. Soden allegedly asked Ms. Ellorin out on a date or for drinks and blew her kisses on

8    more than one occasion.  (Ellorin Decl. ¶¶ 5-6, 10, 18.)  He allegedly told her that she

9    smelled "so good," would notice what she was wearing, and once blew air on the back of

10   her neck and in her ear while standing close and sniffing her.  (*Id.* ¶ 7; Parker Decl. (Dkt.

11   # 36) Ex. D ("Ellorin Dep.") at 68.)  Once, as she left work for the weekend, he allegedly

12   told her not forget to scream his name loudly that night.[4]  (Ellorin Decl. ¶ 12.)  The court

13   agrees that these allegations are not as severe as some reported cases in which the

14   plaintiff alleged physical threats or abuse.  *See, e.g.*, *EEOC v. National Educ. Ass'n,*

15   *Alaska*, 422 F.3d 840, 843 (9th Cir. 2005) (finding triable issue where supervisor

16   frequently shouted profanities at female employees and touched them in a physically

17   threatening manner); *Kang v. U. Lim Am., Inc*., 296 F.3d 810, 817 (9th Cir. 2002)

18   (finding hostile work environment where employer verbally and physically abused

19   plaintiff because of his race).

20   _____

21          [4] As a result of his conduct, Mr. Soden's presence made it difficult for Ms. Ellorin to

22   concentrate on her work.  (Ellorin Decl. ¶ 7.)

ORDER- 15

1    Nevertheless, the foregoing allegations of misconduct do not present the complete

2    picture of Ms. Ellorin's allegations.  In addition to the foregoing, Ms. Ellorin also testifies

3    to frequent and pervasive touching by Mr. Soden, and it is this conduct which in part

4    distinguishes her allegations from the case in *MacDonald*[5] or other similar claims.[6]  As

5    noted above, the required severity of the alleged conduct can vary inversely to its

6    frequency or pervasiveness.  *See McGinest*, 360 F.3d at 1113.  Thus, the conduct at issue

7    need not be as severe when frequency or pervasiveness is high.  Ms. Ellorin testified that

8    Mr. Soden provided instructions to her work group "on a daily basis" and that he would

9    "h[a]ng around [her] work area and . . . find a reason to touch [her]" with the same

10   frequency—"on a daily basis."  (*Id.* ¶¶ 4, 7.)  She testified that Mr. Soden would "touch

11

12   _____

13   [5] In addition to raising doubts about the severity of the alleged harassment, the
*MacDonald* court also cast doubt upon the plaintiff's own subjective experience of the
harassment.  A required element of a hostile environment claim is that the work environment be

14   hostile both objectively and subjectively.  *See Westendorf*, 712 F.3d at 421 ("[Plaintiff] had to
present evidence to support a finding that a 'reasonable person' would find her work

15   environment to be 'hostile or abusive' and that she in fact did so.")  Nevertheless, the
*MacDonald* plaintiff's own testimony raised doubts about her subjective experience of the work
environment as hostile.  *See MacDonald*, 912 P.2d at 1058 (stating that she "did not perceive

16   [the actions at issue] to be sexual harassment at the time they occurred," and that "she was
unsure whether [her coworker] meant [the conduct at issue] to have sexual overtones").  Here, no

17   one has asserted that Ms. Ellorin did not subjectively perceive her work environment as hostile.

18   [6] For example, the Ninth Circuit has granted summary judgment on a hostile environment
claim where the harassment was not physical and the plaintiff was subjected to the conduct only

19   once a week for three months.  *See, e.g.*, *Westendorf  v. W. Coast Contractors of Nev., Inc.*, 712
F.3d 417, 421-22 (9th Cir. 2013) (concluding that coworker's offensive sexual conduct toward

20   plaintiff was not sufficiently severe or pervasive where plaintiff only went to coworker's
workplace once a week for three months and coworker only made offensive sexual remarks on

21   about four occasions, harassment was not physical, and plaintiff did not claim her work
suffered).  By way of contrast, Ms. Ellorin testifies that Mr. Soden subjected her to unwanted

22   touching on "a daily basis."  (Ellorin Decl. ¶ 7.)

1  [her] hand or grab it tightly, rub [her] arms," stroke her hands or arms, or touch her

2  shoulder, when he visited her area.  (*Id.* ¶¶ 4, 7, 10; Ellorin Dep. at 62:11-63:3, 67:11-24;

3  Barnes Decl. (Dkt. # 30) Ex. D ("Ellorin Dep.") at 12:3-18.)  She also testified he would

4  touch or stroke the hands and arms of other female employees as well.[7]  (Ellorin Dep. at

5  11:15-12:11.)  Thus, the fact that some of Mr. Soden's conduct may not be as severe as

6  other cases is not dispositive of Ms. Ellorin's claims on summary judgment due to the

7  frequency and pervasiveness of his allegedly offensive touching in combination with the

8  other conduct described above.

9        Applied Finishing and Mr. Soden also argue that they are entitled to summary

10 judgment on Ms. Ellorin's hostile work environment claim because, even if Ms. Ellorin

11 subjectively believes her testimony and was subjectively offended by Mr. Soden's

12 conduct, she has failed to establish that her work environment, when viewed by a

13 "reasonable person" under the totality of the circumstances, was objectively hostile.  (AF

14 Mot. at 9-10; Soden Mot. at 11); *Westendorf*, 712 F.3d at 421.  Applied Finishing and Mr.

15 Soden assert the work environment could not have been "objectively" hostile because

16

17 ───────────────

   [7] Defendants also assert that the manner in which Mr. Soden touched Ms. Ellorin was
18 simply "friendly" (*see* Gillum Decl. ¶ 4; Fisher Decl. ¶ 6) and not sexual or offensive in nature.
   However, the court must asses the manner in which he touched her in the context of all the
   circumstances, *Dominguez-Curry*, 424 F.3d at 1034 ("In analyzing whether the alleged conduct
19 created an objectively hostile work environment, [the court] must assess all the
   circumstances . . . ."), and on summary judgment draw all inferences in Ms. Ellorin's favor.
20 Given her descriptions of Mr. Soden holding her hands "tightly" and "stroking" or rubbing her
   hands and arms, alongside her allegations concerning his other conduct, such as asking her out
   on dates, blowing on her neck and in her ear, blowing her kisses, and implicitly referencing her
21 sex life when he told her not to forget to scream his name, the court concludes that a reasonable
   juror could conclude that Mr. Soden touched Ms. Ellorin both objectively and subjectively in a
22 sexually offensive manner and not just as a "friendly" gesture.

1   there is "consensus" among the women who have worked with Mr. Soden that, although

2   he is a friendly guy and a "toucher," he does not behave inappropriately.  (AF Mot. at 10;

3   Soden Mot. at 11.)

4          Even assuming that conducting a poll of fellow workers would be the appropriate

5   method for analyzing whether a workplace was "objectively" hostile, the court is

6   unpersuaded by Defendants' argument.  Although some female employees have testified

7   that they never experienced or saw any inappropriate behavior by Mr. Soden (*see* Devi

8   Decl. (Dkt. # 27) ¶¶ 4-7; Porter Decl. (Dkt. # 29) ¶ 5) or that Mr. Soden's conduct in

9   touching other employees was only "friendly" or "completely innocent"(Gillum Decl.

10  (Dkt. # 25) ¶ 4; Fisher Decl. (Dkt. # 28) ¶¶ 5-6), at least one employee has largely

11  corroborated Ms. Ellorin's testimony concerning Mr. Soden's "inappropriate behavior"—

12  including that he blew on female employees' necks and in their ears, asked female

13  employees out for drinks, touched female employees, whispered in their ears, and slapped

14  at least one female employee on her "rear-end" (*see generally* Smith Decl. (Dkt. # 35)).

15  Thus, even if there is a "consensus" among Applied Finishing's female employees that

16  Mr. Soden's behavior was not inappropriate, that "consensus" is certainly not unanimous.

17  The foregoing dispute in testimony creates a factual issue that is not appropriate for

18  resolution on summary judgment and is within the jury's province.  Viewing the evidence

19  in the light most favorable to Ms. Ellorin, the court finds that Applied Finishing and Mr.

20  Soden are not entitled to summary judgment on Ms. Ellorin's hostile work environment

21  claims under either Title VII or WLAD.

22  //

ORDER- 18

### D. Vicarious Liability under Title VII and WLAD

Applied Finishing argues that the Supreme Court's recent decision in *Vance v. Ball State*, --- U.S. ----, 133 S.Ct. 2434 (2013), controls with respect to whether Mr. Soden's alleged harassment is imputable to Applied Finishing. (AF Mot. at 10-11.) In *Vance*, the majority held "that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance*, 133 S.Ct. at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Based on that holding, Applied Finishing argues that Mr. Soden was not Ms. Ellorin's supervisor, did not direct any employee's work, hire or fire anyone, conduct performance evaluations, and did not have the authority to promote, or any other attribute that would make him a supervisor under *Vance*. Thus, Applied Finishing argues that it cannot be held vicariously liable for Mr. Soden's alleged actions toward Ms. Ellorin. (*See* AF Mot. at 10-11.)

Applied Finishing interprets *Vance* too broadly and the factual record before the court too narrowly. We know from *Vance* that "[t]he ability to direct another employee's tasks is simply not sufficient" to confer supervisory status. 133 S.Ct. at 2448. "[S]omething more is required in order to warrant vicarious liability." *Id.* at 2448 (internal quotations omitted). Although the Supreme Court rejected a "more open-ended approach . . . which ties supervisor status to the ability to exercise significant direction

over another's daily work," *id.* at 2443, it nevertheless recognized that supervisor status is

not conferred solely by formal designations but also where an alleged harasser has been

empowered "to make tangible employment decisions" or "take tangible employment

actions" against the victim, *id.*; *see id.* at 2448 ("[T]he authority to take tangible

employment actions is the defining characteristic of a supervisor . . . .").

This point was emphasized by the *Vance* majority when it confirmed that the

alleged harassers in an earlier Supreme Court case, *Faragher v. City of Boca Raton*, 524

U.S. 775 (1998), were "supervisors" under Title VII even though they held the same

position as the plaintiff.  *See Vance*, 133 S.Ct. at 2446-47,  2446 n.8.  According to the

*Vance* majority, the individual defendants in *Faragher* were "supervisors" because their

recommendations with respect to hiring, supervision, and discipline were in practice

often followed.  *See id.*  Indeed, the Supreme Court made clear that "tangible

employment actions can be subject to . . . approval" by higher management.  *Id.* at 2447

n.8.

The *Vance* Court further recognized that where an employer "attempt[s] to confine

decisionmaking power to a small number of individuals, those individuals will have a

limited ability to exercise independent discretion when making decisions and will likely

rely on other workers who actually interact with the affected employee."  *Id.* at 2452.

Thus, even where an alleged harasser does not have power to take formal actions vis-à-

vis the victim, the alleged harasser may have substantial input into those decisions, if he

or she is more familiar with the victim's work than the off-site manager with actual direct

authority to take the formal action.  *Id.* (citing *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d

1   498, 509 (7th Cir. 2004)).  "Under those circumstances, the employer may be held to

2   have effectively delegated the power to take tangible employment actions to the

3   employees on whose recommendation it relies."  *Vance*, 133 S.Ct. at 2452.

4        When applied to this case, the reasoning of the *Vance* decision renders summary

5   judgment inappropriate because questions of fact remain about Mr. Soden's supervisory

6   status.  Ms. Ellorin has testified that Mr. Soden provided direction or instruction to the

7   production team on a daily basis.  (Ellorin Decl. ¶ 4.)  Based on the *Vance* decision, we

8   know that providing direction to other employees alone is not enough to confer

9   supervisory status.  *Id.* at 2448.  To make out a claim for vicarious liability, Ms. Ellorin

10  must demonstrate that Mr. Soden could play a significant, possibly determinative role, in

11  such matters as "hiring, firing, failing to promote, [or] reassignment with significantly

12  different responsibilities."  *Id.* at 2443.  Although both Mr. Soden and Mr. Bickle have

13  testified that Mr. Soden played no role in hiring, firing or supervising employees, the

14  record is not unwavering in this respect.  (Soden Dep at 23:23-24:9; Bickle Dep. at

15  12:23-24.)  Mr. Alligood has testified that Mr. Soden has played a role in hiring

16  employees at the company and that he could make recommendations concerning

17  termination.  (Alligood Dep. at 6:3-4; 5:18-6:2; 6:5-10:9.)  In addition, Ms. Ellorin

18  testifies that it was Mr. Soden who announced to her team that she was going to be

19  promoted to the quality assurance position and begin training in that position.  (Ellorin

20  Decl. ¶ 14.)  The fact that Mr. Soden was designated a manager (Bickle Dep. at 12:10-14;

21  Soden Dep. at 23:19-20), who, at least at times, and perhaps "on a daily basis," directed

22  Ms. Ellorin's work (Ellorin Decl. ¶ 4), and (as one owner of the company has testified)

1  played a role in hiring and could make recommendations concerning termination

2  (Alligood Dep. at 5:18-10:9), makes it reasonable to infer that Mr. Soden would have had

3  a significant role in Ms. Ellorin's performance reviews and eligibility for promotion to

4  the quality assurance position.  Based on this evidence, the court concludes that Applied

5  Finishing is not entitled to summary judgment on this issue, but rather that it is properly

6  reserved for the jury.[8]

7       **E.  Negligence under Title VII and WLAD**

8            Applied Finishing asserts that it is entitled to summary judgment with respect to

9  its own negligence under Title VII and the WLAD.  (AF Mot. at 11-13.)  "[W]here

10  harassment by a co-worker [as opposed to a supervisor or manager] is alleged, the

11  employer can be held liable only where 'its own negligence is a cause of the

12  harassment.'"  *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001) (citing *Ellerth*,

13  524 U.S. at 759).  "Title VII liability is direct, not derivative: An employer is responsible

14  for its own actions or omissions, not for the coworker's harassing conduct."  *Swenson*,

15  271 F.3d at 1191–92.  Where one coworker allegedly harasses another coworker, the

16  employer may be liable if it knows or should know of the harassment but fails to take

17  steps "reasonably calculated to end the harassment."  *Dawson v. Entek Int'l*, 630 F.3d

18  928, 938 (9th Cir. 2011); *see also* 29 C.F.R. § 1604.11(d) ("With respect to conduct

19

20       [8] The court is mindful of the *Vance* majority's observation that the "the question of
21  supervisor status, when contested, can very often be resolved as a matter of law before trial."
    *Vance*, 133 S.Ct. at 2450.  Nevertheless, where as here "there are genuine factual disputes about
22  an alleged harasser's authority to take tangible employment actions," "the issue of supervisor
    status cannot be eliminated from the trial."  *Id.*

1   between fellow employees, an employer is responsible for acts of sexual harassment in

2   the workplace where the employer (or its agents or supervisory employees) knows or

3   should have known of the conduct, unless it can show that it took immediate and

4   appropriate corrective action.").

5          Applied Finishing asserts that if Mr. Soden was not Ms. Ellorin's "supervisor" for

6   Title VII purposes, then it is entitled to summary judgment with respect to its own

7   negligence on grounds that it was not on notice of Mr. Soden's behavior until the initial

8   conversation between Ms. Ellorin's husband and Mr. Bickle, and that once the company

9   was on notice, it took reasonable measures to investigate and prevent any further

10  harassment to Ms. Ellorin.  (AF Mot. at 11-13.)  Once again, the court cannot conclude

11  that Applied Finishing is entitled to summary judgment.  First, as detailed above and

12  contrary to Applied Finishing assertions, there is evidence that Ms. Ellorin's "lead" was

13  aware of at least some of Mr. Soden's objectionable conduct prior to Mr. Lee's telephone

14  conversation with Mr. Bickle.  (*See* Ellorin Decl. ¶ 12.)  Second, there is also evidence

15  from which a reasonable juror could conclude that the measures Applied Finishing took

16  after Mr. Lee's telephone call were not reasonably sufficient to stop the alleged

17  harassment.  After all, Ms. Ellorin testified that Mr. Soden blew her a kiss just outside of

18  Mr. Alligood's office the morning after Mr. Lee first telephoned Mr. Bickle concerning

19  Mr. Soden's objectionable conduct.  (*See* Ellorin Decl. ¶ 18.)  In addition, she also

20  subsequently heard Mr. Soden asking another female employee out on a date.  (*See id.*

21  ¶ 21.)  Further, there is no evidence that the company considered any step to stop the

22  harassment other than counseling Mr. Soden concerning his behavior and the type of

1  conduct the company expected.  Although a reasonable juror could conclude that the

2  company's response was adequate and reasonably executed under the circumstances of

3  this case, such a juror would not be compelled to so conclude.  Accordingly, the court

4  denies summary judgment on this issue.

5  **F.  Quid Pro Quo Liability**

6  To prove actionable harassment under a quid pro quo or "tangible employment

7  action" theory under Title VII, Ms. Ellorin must show that Mr. Soden "explicitly or

8  implicitly conditioned her job, a job benefit, or absence of detriment on her acceptance of

9  sexual conduct." *Craig v. M & O Agencies, Inc*., 496 F.3d 1047, 1054 (9th Cir. 2007).

10  WLAD imposes similar requirements with respect to a quid pro quo claim. *See*

11  *Thompson v. Berta Enterprises, Inc.*, 864 P.2d 983, 986-87 (Wash. Ct. App. 1994) ("In

12  order to establish quid pro quo harassment under RCW 49.60 an employee must prove

13  (1) she belongs to a protected group, (2) she was subject to unwelcome sexual

14  harassment, (3) the harassment was based on gender and (4) her reaction to the

15  harassment complained of affected tangible aspects of the employee's compensation,

16  terms or conditions of employment."); *see also Pacific Intern'l Grout Co. v. Zinkova*, No.

17  2:12–cv–00778–MJP, 2012 WL 3051771, at *4 (W.D. Wash. July 25, 2012).  Applied

18  Finishing and Mr. Soden assert that there is no evidence that Mr. Soden explicitly or

19  implicitly conditioned Ms. Ellorin's placement in the quality assurance position on her

20  acceptance of his unwelcome conduct.  (AF Mot. at 14; Soden Mot. at 12-13.)  With

21  respect to this claim, the court agrees.

22

1    Without some evidence of a causal connection between Mr. Soden's alleged

2    conduct and Ms. Ellorin's alleged job detriment in failing to attain the quality assurance

3    position or being laid off, her quid pro quo harassment claim cannot survive summary

4    judgment. *See Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 298

5    (S.D.N.Y. 2011).  There is no testimony or other evidence before the court that Mr.

6    Soden ever explicitly demanded that Ms. Soden submit to his allegedly offensive

7    conduct.  Indeed, Ms. Ellorin herself agreed that Mr. Soden never explicitly told her that

8    she would get her promotion if she agreed to go on a date with him (Ellorin Dep at 67:25-

9    68:4), and she also agreed that he never explicitly told her she would get better benefits

10   or promotions if she agreed to have sexual relations with him (*id.* at 76:15-23).

11   The only evidence of an implicit demand is Ms. Ellorin's testimony that she

12   spurned Mr. Soden's advances and subsequently a male coworker was placed in the

13   quality assurance position and she was laid off.  The mere chronological juxtaposition of

14   these events alone, however, is insufficient to raise a genuine issue of fact concerning

15   causation.  *See, e.g.*, *Dochniak v. Dominium Mgmt. Servs., Inc.*, No. 06-237 (JRT/FLN),

16   2007 WL 2669443, at *3 (D. Minn. Sept. 6, 2007) ("The mere timing of [plaintiff's]

17   demotion, one day after refusing [assistant manager's] sexual advances, is not sufficient

18   by itself to support an inference that her refusal was connected to the demotion.").

19   Although the Ninth Circuit has held that causation may be inferred based on temporal

20   proximity alone in the context of a retaliation claims, *see, e.g.*, *Ray v. Henderson*, 217

21

22

1    F.3d 1234, 1244 (9th Cir. 2000), the court finds no instance where the Ninth Circuit has

2    extended this rule to quid quo pro harassment claims.[9]

3         Even if, however, the court could consider temporal proximity alone to infer

4    causation, Ms. Ellorin's evidence would be insufficient to survive Defendants' motion for

5    summary judgment.  Where a plaintiff relies on evidence of temporal proximity, the case

6    law "uniformly hold[s]" that the temporal link "must be very close." *Clark Cnty. Sch.*

7    *Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  Ms. Ellorin testifies that Mr. Soden

8    "stopped his advances" after August 20, 2012.  (*See* Ellorin Decl. ¶ 22.)  She was not laid

9    off until May 3, 2013.  (*Id.* ¶ 24.)  The more than eight month gap between Mr. Soden's

10   allegedly offending conduct and Ms. Ellorin's termination is too remote to infer causality

11   between the two.  *See Breeden*, 532 U.S. at 273-74 (citing case law concerning causal

12   connection requirement in context of a retaliation case indicating that a three or four

13   month gap is insufficient).

14        With respect to Ms. Ellorin's failure to attain the quality assurance position, none

15   of the evidence before the court grounds Ms. Ellorin's failure to attain the position or Mr.

16   _____

17   [9] The court notes, however, that other circuit courts have considered temporal proximity
     along with other evidence in deciding causation in the context of quid pro quo claims.  *See, e.g.*,
18   *Frensley v. N. Miss. Medical Center, Inc.*, 440 Fed. App'x 383, 387 (5th Cir. 2011) ("We agree
     with our sister circuits that temporal proximity evidence can be considered along with other
19   circumstances in deciding causation.") (citing *Papelino v. Albany Coll. of Pharmacy of Union
     Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (finding a genuine fact issue as to causation based on close
20   temporal proximity and other evidence in a quid pro quo case); *Cotton v. Cracker Barrel Old
     Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006) (stating in dicta that "temporal
21   proximity between harassment and a tangible employment action can give rise to a genuine issue
     of fact as to causation . . . ."); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 285 (3d Cir.
22   2000) (using temporal proximity evidence in evaluating the causal nexus at the summary
     judgment phase in a quid pro quo case)).

1   Martinez's installation in the position to a specific time or period of time.  (*See* Ellorin

2   Decl. ¶ 23 ("I was never given the Quality Assurance position . . . . Another employee,

3   Antonio Martinez, was transferred to Quality assurance; and he took the position I was

4   promised before I complained.").  As a result, the court can draw no reasonable inference

5   as to the temporal proximity between the allegedly harassing conduct and her failure to

6   be promoted.  *See, e.g.*, *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 289-

7   99 (S.D.N.Y. 2011) ("[Plaintiff's] testimony does not ground any of [Defendant's]

8   allegedly harassing behavior in a specific time period, so the Court can draw no

9   reasonable inference as to the temporal proximity of that behavior to [Plaintiff's] alleged

10  firing.").  Accordingly, this evidence is also insufficient to infer causation or avoid

11  summary judgment.

12        More importantly, however, Ms. Ellorin's own testimony negates any claim that

13  Mr. Soden was implicitly conditioning her promotion on her acquiescence to his conduct.

14  In response to a question concerning whether Mr. Soden had conditioned job benefits or

15  promotions on her acquiescence to his demands, she replied:  "No. He didn't say that, and

16  I knew that I was qualified, and that I could earn those promotions anyway on my own."

17  (*Id.* at 76:23-25.)  Thus, Ms. Ellorin indicates that she believed that she was capable of

18  attaining promotions at Applied Finishing irrespective of Mr. Soden's behavior.  In light

19  of this testimony, the court agrees that Applied Finishing and Mr. Soden are entitled to

20  summary judgment on Ms. Ellorin's claim for quid pro quo harassment.  There is simply

21  no evidence upon which a reasonable juror could conclude that Mr. Soden either

22  explicitly or implicitly conditioned a job benefit or the absence of a job detriment on her

ORDER- 27

1    submission to his behavior or demands.  Without some evidence of a causal connection

2    between the alleged sexual harassment and the adverse employment actions she alleges,

3    the court must dismiss Ms. Ellorin's quid pro quo sexual harassment claim.  The court,

4    therefore, grants Defendants' motions for summary judgment with respect to this claim.

5         **G.  Applied Finishing' Affirmative Defense to Vicarious Liability**

6         If a supervisor has sexually harassed an employee, the employer can assert an

7    affirmative defense and avoid liability if it can show that: (1) it took no tangible

8    employment action against the employee; (2) it exercised reasonable care to prevent and

9    correct the harassment; and (3) the employee unreasonably failed to take advantage of

10   preventive or corrective opportunities.  *Hardage v. CBS Broadcasting, Inc.*, 427 F.3d

11   1177, 1183-84 (9th Cir. 2005).

12        Applied Finishing asserts that it is entitled to summary judgment on this

13   affirmative defense.  (AF Mot. at 15-16.)  Even assuming that Applied Finishing took no

14   tangible employment action against Ms. Ellorin, it is not entitled to summary judgment

15   on this issue.  Applied Finishing asserts that it is entitled to summary judgment because

16   Ms. Ellorin admits that she did not personally complain to Randy or Pam Bickle or Mike

17   Alligood, or even to her lead, Michell Gillum.  (*See id.* at 15 (citing Ellorin Dep. at

18   79:16-80:19).)  Ms. Ellorin's husband, however, did initially notify the company on her

19   behalf on May 14, 2012—approximately five months after the conduct at issue started.

20   (*See* Ellorin Decl. ¶¶ 17; *see also id.* ¶¶ 2, 4 (indicating that Ms. Ellorin became a full-

21   time direct employee of the company on January 22, 2012, and "immediately noticed

22   [Mr.] Soden behaving inappropriately towards some female employees . . . .").)  Further,

1   Ms. Ellorin has testified that even if she did not report the harassment to Ms. Gillum, Ms.

2   Gillum observed it herself.[10]  (*See, e.g.*, Ellorin Dep. at 80:1-5 ("Q:  [D]id you ever

3   initiate a conversation with Michelle Gillum about your complaints? . . .  A:  No.  It was

4   Michelle herself who saw it, and that's where it all started."); *see also* Ellorin Decl. ¶ 18.)

5   In any event, the fact that she reported the problem through an intermediary (her

6   husband) rather than personally does not entitle Applied Finishing to summary judgment

7   on the affirmative defense.  *See, e.g.*, *Erickson v. Daimler Trucks N. Am., LLC*, No. CV-

8   10-0132-ST, 2011 WL 4753534, at *11 (D. Or. July 20, 2011) ("Even if a plaintiff does

9   not follow reporting requirements of the company's anti-harassment policy, the employer

10  may still be on notice.") (citing *Nichols v. Azteca Restaurant Enters.*, 256 F3d 864, 870-

11  71 (9th Cir. 2001)).

12          Once Applied Finishing was on notice of the alleged harassment (which there is

13  no dispute occurred at least as of the day Mr. Lee spoke with Mr. Bickle on the

14  telephone), it was required to exercise reasonable care to correct the alleged harassment.

15  *See Kohler*, 244 F.3d at 1181 ("The [reasonable care] prong of the affirmative defense

16  also requires [the employer] to demonstrate that it exercised reasonable care to promptly

17  correct sexually harassing behavior.").  The Ninth Circuit has held that an employer's

18  adoption of an anti-harassment "policy and its efforts to disseminate the policy to its

19  employees establish that [the employer] exercised reasonable care to prevent sexual

20  harassment in the workplace."  *Kohler v. Inter–Tel Techs.*, 244 F.3d 1167, 1180 (9th Cir.

21  _____

22      [10] Ms. Gillum denies having seen any harassment during her time at Applied Finishing
    (Gillum Decl. ¶ 12), but this testimony simply creates a fact issue for trial.

1    2001) *see also Ellerth*, 524 U.S. at 765.  Although Applied Finishing has a policy

2    prohibiting sexual harassment in its employee handbook (Bickle Dep. at 10:5-22), there is

3    no evidence that the employee handbook was in place at the time Ms. Ellorin started

4    working at Applied Finishing or that she ever received a copy (Alligood Dep. at 22:16-

5    23:2).  Further, although testimony indicates that the employee handbook was in place

6    before Mr. Soden came to work for the company (Bickle Dep. at 10:5-14), Mr. Bickle

7    does not recall if he reviewed the company's sexual harassment policy with Mr. Soden,

8    told him what it was, or even gave him a copy of it during their counseling session

9    concerning Ms. Ellorin's complaints.  (*Id*. at 34:13-25, 35:5-10.)  Indeed, Mr. Bickle has

10   no specific recollection of ever giving Mr. Soden a copy of the company's policy.  (*Id.* at

11   35:11-14.)  More importantly, Mr. Soden has acknowledged that although there was a

12   copy of the employee handbook available in the office when he started at the company,

13   he never reviewed it with anyone, including Mr. Bickle or Mr. Alligood.  (Soden Dep. at

14   49:7-50:7.)  Finally, after Mr. Bickle's initial counseling session with Mr. Soden, Ms.

15   Ellorin has testified that episodes of the conduct at issue continued.  (Ellorin Decl.

16   ¶¶ 18-21.)  Thus, although Applied Finishing may ultimately be able to establish its

17   affirmative defense at trial, on the record before the court, it is not entitled to summary

18   judgment.

19       **H.  Retaliation under Title VII and WLAD**

20        To prevail on her retaliation claim, Ms. Ellorin must show:  (1) that she engaged

21   in a protected activity; (2) that she suffered an adverse employment action; and (3) that

22   there is a causal connection between the protected activity and the adverse employment

1    action. *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 965 (9th Cir. 2004).  The

2    showings required for a retaliation claim under both Title VII and the WLAD are

3    identical, except for the causation element.  Under Title VII, Ms. Ellorin must prove that

4    her protected activity was the "but-for" cause of the adverse employment action, while

5    under the WLAD she must merely demonstrate that the protected activity was a

6    "substantial factor" in the employer's decision to take the adverse employment action.

7    *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ---, 133 S.Ct. 2517, 2521 (2013) (holding

8    that "Title VII retaliation claims require proof that the [employer's] desire to retaliate was

9    the but-for cause of the challenged employment action"); [11] *Allison v. Hous. Auth. of City*

10   *of Seattle*, 821 P.2d 34, 42-43 (Wash. 1991) (rejecting "but-for" standard of causation in

11   favor of more lenient "substantial factor" standard).  Once Ms. Ellorin has made out a

12   prima facie case, the burden of production then shifts to Defendants to advance

13   legitimate, nonretaliatory reasons for any adverse actions taken against Ms. Ellorin, then

14   she has the ultimate burden of showing that employer's proffered reasons are pretextual.

15   *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994).

16        Both Applied Finishing and Mr. Soden argue that the court should dismiss Ms.

17   Ellorin's claims for retaliation because she has failed to demonstrate the third element of

18   _____

19        [11] *Nassar* created a new burden on plaintiffs to show but-for causation in Title VII
     retaliation claims. 133 S.Ct. at 2534.  For claims of status-based discrimination (race, color,

20   national origin, sex, religion), a plaintiff need only show that "the motive to discriminate was one
     of the employer's motives, even if the employer also had other, lawful motives." *Id.* at 2523.  For

21   claims of retaliation, on the other hand, a plaintiff must meet a higher standard:  "Title VII
     retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged

22   employment action."  *Id.* at 2528.

ORDER- 31

1    her prima facie case—a causal connection between her or her husband's complaints about

2    Mr. Soden's alleged harassment and her failure to obtain the quality control position or

3    being laid off.[12]  (AF Mot. at 18-20; Soden Mot. at 14.)  The court concludes that Ms.

4    Ellorin has failed to raise a genuine issue of material fact regarding this element.  Ms.

5    Ellorin provides no direct evidence of but-for causation, and instead asks the court to

6    infer causation from the chain of events.  Specifically, following her husband's

7    complaints to Mr. Bickle on May 14, 2012, and August 20, 2012, Ms. Ellorin states that

8    she "was never given the Quality Assurance position that [she] had been promised" and

9    instead "[a]nother employee, Antonio Martinez, was transferred to Quality Assurance"

10   and "took the position [she] was promised before [she] complained."  (Ellorin Decl.

11   ¶ 23.)  In addition, she states that on May 3, 2013, she was laid off while Mr. Martinez

12   continued to work in the Quality Assurance position.  (*Id.* ¶ 24.)

13       The Ninth Circuit has held that causation "may be inferred from circumstantial

14   evidence, such as the employer's knowledge that the plaintiff engaged in protected

15   activities and the proximity in time between the protected action and the allegedly

16   _____

17   [12] Neither Applied Finishing nor Mr. Soden challenged the first element of Ms. Ellorin's
     retaliation claim on summary judgment.  With respect to the second element, both argued that
18   due to cutbacks in the company's workforce no quality control position was ever created.
     (Bickle Decl. ¶ 2; *see also* 9/5/13 Alligood Decl. (Dkt. # 42) ¶¶2-3.)  Ms. Ellorin, however,
19   testified that the position was not only created, but in fact filled by Antonio Martinez, a male
     coworker (Ellorin Decl. ¶¶ 23-24).  Viewing these facts in the light most favorable to Ms.
20   Ellorin, a reasonable juror could believe her testimony and conclude that the position had been
     created and that one of Ms. Ellorin's male coworkers had been installed in it rather than her.
21   However, in light of the court's ruling that Ms. Ellorin fails to raise a genuine issue of fact with
     respect to the causation element of her prima facie retaliation claim, Defendants are still entitled
22   to summary judgment on this claim.

1    retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.

2    1987); *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) ("That an employer's

3    actions were caused by an employee's engagement in protected activities may be inferred

4    from proximity in time between the protected action and the allegedly retaliatory

5    employment decision.") (internal quotations omitted).[13]   The Supreme Court, however,

6    has clarified that for a plaintiff to establish causation in prima facie case of retaliation

7    only on the basis of "temporal proximity between an employer's knowledge of protected

8    activity and an adverse employment action, . . . the temporal proximity must be very

9    close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (citing

10   cases from circuit courts holding that a three-month or four-month time lapse is

11   insufficient to infer causation).

12            Here, Ms. Ellorin's evidence with respect to temporal proximity is simply

13   insufficient to establish a prima facie case of retaliation, let alone that Applied

14   Finishing's proffered explanation is pretextual.  Undisputed evidence establishes that

15   there was a gap of approximately eight months between Mr. Lee's second conversation

16   with Mr. Bickle concerning Mr. Soden's conduct and the date that Ms. Ellorin was laid

17   off.  (*See* Ellroin Decl. ¶¶ 22, 24.)   As discussed above, this length of time is simply

18   insufficient to establish causation for a retaliation claim based on the temporal proximity

19

20            [13] An employer's awareness of the protected activity is required to supply evidence of a
     causal link between the protected activity and the adverse action.  *See Cohen v. Fred Meyer, Inc.*,
21   686 F.2d 793, 796 (9th Cir. 1982).  There is no dispute with respect to Applied Finishing
     knowledge of Mr. Lee's conversations with Mr. Bickle on Ms. Ellorin's behalf concerning Mr.
22   Soden's allegedly harassing behavior.

1    alone. *See Breeden*, 532 U.S. at 273. With respect to Ms. Ellorin's claim that, prior to

2    her termination, a male employee was promoted to the quality assurance position instead

3    of her, she has not presented the court with specific information concerning when this

4    event occurred. It apparently happened at some point after Mr. Lee's second

5    conversation with Mr. Bickle (August 20, 2012) and before her termination (May 3,

6    2013), but there is no indication of precisely when Mr. Martinez assumed the quality

7    assurance position. (*See id.* ¶¶ 22-24.) Absent any evidence that his promotion occurred

8    "very close" to Mr. Lee's second conversation with Mr. Bickle, *see Breeden*, 532 U.S. at

9    273, the court concludes that Applied Finishing and Mr. Soden are entitled to summary

10   judgment on this claim. Ms. Ellorin has simply presented insufficient evidence of

11   causation to raise a genuine issue of material fact with respect to her prima facie case of

12   retaliation.[14]

13            **I.  Differential Treatment under Title VII and WLAD**

14            Ms. Ellorin's claims that Defendants subjected her to differential treatment

15   because of her sex in violation of Title VII and WLAD. (Compl. ¶¶ 46-50, 92-96.)

16   Defendants move to dismiss these claims for failure to properly plead or on summary

17   judgment. (AF Mot. at 17; Soden Mot. at 13.)

18   _____

19       [14] At least one district court within the Ninth Circuit has concluded that following the
     Supreme Court's decision in *Nassar* evidence of knowledge and proximity in time alone is
20   insufficient to create a disputed issue of fact on causation with respect to a retaliation claim. *See
     Drottz v. Park Electrochemical Corp.*, No. CV 11-1596-PHX-JAT, 2013 WL 6157858, at *14-
21   *16 (D. Ariz. Nov. 25, 2013). This court need not decide this issue because, as discussed above,
     even assuming that evidence of close temporal proximity remains sufficient in some
22   circumstances to raise a genuine issue of fact on causation for a retaliation claim, Ms. Ellorin
     fails to provide such evidence here.

1    Title VII and WLAD claims for disparate treatment are both considered under the

2    burden shifting analysis established by the Supreme Court.  *See McDonnell Douglas*

3    *Corp. v. Green*, 411 U.S. 792, 802-805 (1973); *see also Domingo v. Boeing Employees'*

4    *Credit Union*, 98 P.3d 1222, 1225 (Wash. Ct. App. 2004).  Under the *McDonnell*

5    *Douglas* framework, the plaintiff first must establish a prima facie case of discrimination.

6    *Chuang v. University of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).  Specifically,

7    plaintiff must show that he or she (1) belongs to the protected class; (2) was qualified for

8    the position; (3) was subject to an adverse employment action; and (4) similarly situated

9    employees outside the protected class were treated more favorably.  *Id.*  Next, the burden

10   of production shifts to the defendant to articulate a legitimate nondiscriminatory reason

11   for its decision.  *Wallis v. J.R. Simplot Co*., 26 F.3d 885, 889 (9th Cir. 1994).  Finally, the

12   burden shifts back to the plaintiff to demonstrate that the reason offered by the defendant

13   is a pretext for an underlying discriminatory motive.  *Chuang*, 225 F.3d at 1123.  The

14   plaintiff must show that the articulated reason is pretextual "either directly by persuading

15   the court that a discriminatory reason more likely motivated the employer or indirectly by

16   showing that the employer's proffered explanation is unworthy of credence." *Texas*

17   *Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

18        Although, as a general matter, the plaintiff in an employment discrimination action

19   need produce very little evidence in order to overcome an employer's motion for

20   summary judgment, *Chuang*, 225 F.3d at 1124, Ms. Ellorin has failed to meet even this

21   low bar with respect to her differential treatment claims.  When asked about the claims

22   during her deposition, Ms. Ellorin's attorney objected stating that she could not answer

1   without "the assistance of counsel," and Ms. Ellorin was unable to provide any factual

2   details:

3       Q:  [Your complaint] says that Mike Soden discriminated against you by
        subjecting you to differential treatment because of your sex.  What that says
4       to me is that he favored males over you because you're a female.  Am I
        misinterpreting what you mean?

5
            Mr. Parker:  I object to the question, because it can't be answered
6       without the assistance of counsel.

7           Mr. Barnes:  Oh I see, because it's a matter of legal analysis?

8           Mr. Parker:  Correct.

9   By Mr. Barnes:

10      Q:  You've heard the objection.  The question is are you able to answer this
        without invoking legal doctrine that your lawyer would know about?

11
        A:  No.
12
    (Ellorin Dep.  77:22-78:12.)
13
            Despite the objection that questions concerning Ms. Ellorin's differential treatment
14
    claims were "a matter of legal analysis," Ms. Ellorin's attorney never discussed the claim
15
    in either of the responsive memoranda he drafted to Defendants' motions for summary
16
    judgment.  (*See generally* Resp. to AF Mot. (Dkt. # 33); Resp. to Soden Mot. (Dkt. #
17
    38).)  "A party opposing a properly supported motion for summary judgment may not
18
    rest upon the mere allegations or denials in pleadings, but 'must set forth specific facts
19
    showing that there is a genuine issue for trial.'" *MAI Sys. Corp. v. Peak Computer, Inc.*,
20
    991 F.2d 511, 518 (9th Cir.1993) (citation omitted).  Neither Ms. Ellorin nor her counsel
21
    have done anything to flesh out her differential treatment claim, explain how the facts she
22

1   alleges conform to the elements of the claim, or explain how her differential treatment

2   claims under Title VII and WLAD are different from her hostile work environment or

3   quid pro quo claims.  Based on the foregoing, the court finds that Ms. Ellorin has for all

4   intents and purposes abandoned her claims for differential treatment and Defendants are

5   entitled to dismissal.

6          Further, Ms. Ellorin's differential treatment claims fair no better based on the

7   court's own review of the factual record.  An adverse employment action upon which a

8   differential treatment claim may be based includes a significant change in employment

9   status, such as "hiring, firing, failing to promote, reassignment with significantly different

10  responsibilities, or a decision causing a significant change in benefits."  *Ellerth*, 524 U.S.

11  at 761.  "A tangible employment action in most cases inflicts direct economic harm." *Id.*

12  at 762; *see also Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (no

13  adverse employment action where the plaintiff "was not demoted, was not stripped of

14  work responsibilities, was not handed different or more burdensome work

15  responsibilities, was not fired or suspended, was not denied any raises, and was not

16  reduced in salary or in any other benefit.").  The only actions in the record that might

17  support this element of the claims include Applied Finishing's failure to place Ms. Ellorin

18  in the quality assurance position and its subsequent decision to terminate her job.

19         Applied Finishing, however, has countered with legitimate nondiscriminatory

20  reasons for these decisions—namely that the position itself, although discussed, was

21  never created or filled, and Ms. Ellorin was laid off as part of a general downsizing due to

22  poor economic conditions.  (*See* R. Bickle Decl. ¶ 2; Bickle Dep. at 47:12-48:5.)  Indeed,

1  Mr. Martinez, the male coworker that Ms. Ellorin testifies was placed in the Quality

2  Assurance position instead of her, was also subsequently laid off.  (12/5/13 Alligood

3  Decl. (Dkt. # 42) ¶ 4.)

4         The only evidence that Ms. Ellorin can point to as demonstrating that Applied

5  Finishing's proffered explanation is pretextual is Mr. Soden's earlier objectionable

6  conduct.  As discussed above, however, the court has already found that Ms. Ellorin has

7  failed to establish that Mr. Soden's conduct is sufficiently close in time to Applied

8  Finishing's alleged promotion of Mr. Martinez or Ms. Ellorin's termination to provide a

9  causal link between the company's actions and Mr. Soden's conduct.  (*See supra* § III.H.)

10 For the same reasons, the court finds that Ms. Ellorin fails to raise a material issue of fact

11 that a discriminatory reason more likely motivated Applied Finishing or that its proffered

12 explanation concerning her termination or failure to attain the quality assurance position

13 is unworthy of credence.

14        **J.   State Law Tort Claims Duplicative of Title VII and WLAD Claims**

15        Defendants move for summary judgment of Ms. Ellorin's state law claims arguing

16 that such claims must be dismissed under Washington law as duplicative of her WLAD

17 claims.  (AF Mot. at 18; Soden Mot. at 15.)  Washington courts have held that common

18 law tort claims, such as negligent infliction of emotional distress, negligent supervision,

19 and intentional infliction of emotional distress (which is also known as the tort of

20 outrage), that are based on the same facts underpinning a plaintiff's claim for unlawful

21 discrimination, are duplicative of the discrimination claim and therefore must be

22 dismissed.  *See Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1192-93 (Wash. Ct.

App. 2000) (trial court properly dismissed claims for negligent infliction of emotional

distress and negligent supervision or retention where those claims relied on the same

underlying facts supporting plaintiffs' discrimination claim); *Haury v. Snow*, 31 P.3d

1186, 1193 (Wash. Ct. App. 2001) (ruling that an employee may recover damages for

emotional distress in an employment context but only if the factual basis for the claim is

distinct from the factual basis for the discrimination claim); *see also Anaya v. Graham*,

950 P.2d 16, 20 (Wash. Ct. App. 1998) (affirming trial court's dismissal of claim of

outrage because it "duplicates the discrimination claim").  Such claims can "only arise[]

when the claim is based on a separate factual basis from the sexual discrimination claim."

*Haury*, 31 P.3d at 1193.  There is no dispute that the same factual allegations that

underpin Ms. Ellorin's WLAD claims also underpin her state law claims.  (*See generally*

Compl.)  Accordingly, the court grants Defendants' motion for summary judgment with

respect to Ms. Ellorin's claims for sexual battery (*id.* ¶¶ 56-62), intentional infliction of

emotional distress (*id.* ¶¶ 63-67), negligent infliction of emotional distress (*id.* ¶¶ 68-72),

and negligent hiring and supervision (*id.* ¶¶ 73-77).[15]

//

//

//

_____

[15] Because the court dismisses these claims as duplicative under Washington law, there is
no need for the court to consider Defendants' motions for summary judgment based on the
substance of these claims or Applied Finishing motion for summary judgment based on the
absence of grounds to impose respondeat superior.  (*See* Soden Mot. at 3-5; AF Mot. at 16-17,
20.)

### K.  **Punitive Damages**

Defendants move for summary judgment with respect to any award of punitive damages under WLAD.[16]  (AF Mot. at 21; Soden Mot. at 15.)  In Washington, such damages are contrary to public policy and not available under WLAD.  *Dailey v. N. Coast Life Ins. Co.*, 919 P.2d 589, 590-91 (Wash. 1996).  Accordingly, the court grants Defendants' motion for summary judgment on this issue.

Applied Finishing also moves for summary judgment with respect to any award of punitive damages under Title VII.  (AF Mot. at 21-22.)  The availability of punitive damages in a Title VII case is governed by statute.  Section 1981a(b)(1) of Title 42 provides:

> A complaining party may recover punitive damages under [Title VII] against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1).  In *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), the Supreme Court concluded a defendant is appropriately subject to punitive damages if it acts "in the face of a perceived risk that its actions will violate federal law." *Id.* at 536.  Punitive damages "apply in intentional discrimination cases where the plaintiff can show that the employer knowingly or recklessly acted in violation of federal law." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1197 (9th Cir. 2002) (citing *Kolstad*,

---

[16] The court need not consider whether punitive damages would be available under any of Ms. Ellorin's other state claims because the court has dismissed these claims on summary judgment.  (*See supra* § III.J.)

ORDER- 40

527 U.S. at 535).  Even if the plaintiff makes this showing, the employer may nonetheless

"escape punitive damages if it can show that the challenged actions were not taken by

senior managers and were contrary to the employer's good faith implementation of an

effective antidiscrimination policy."  *Costa v. Desert Palace, Inc*., 299 F.3d 838, 864 (9th

Cir. 2002) (citations omitted), *aff'd on other grounds, Desert Palace, Inc. v. Costa*, 539

U.S. 90 (2003).  It is premature to grant summary judgment on the issue of entitlement to

punitive damages.  As described above, factual disputes exist with respect to Mr. Soden's

status as a supervisor or senior manager and with respect to Applied Finishing timely

implementation or distribution of its employee handbook which contained its

antidiscrimination policies.  Accordingly, the court denies Applied Finishing's motion

with respect to punitive damages under Title VII.

## IV.   CONCLUSION

As described above, the court GRANTS in part and DENIES in part Applied

Finishing's motion for summary judgment (Dkt. # 21) and Mr. Soden's motion for

summary judgment (Dkt. # 22).

Dated this 7th day of February, 2014.

JAMES L. ROBART
United States District Judge